# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| JACK C. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 3:14-CV-1468 JVB |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Jack Johnson seeks review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1382c(a)(3)(A). Plaintiff asks the Court to reverse the Commissioner's decision and award benefits, or in the alternative, remand the decision for further proceedings. For the following reasons, the Court grants Plaintiff's request for remand.

## A. Procedural Background

On July 5, 2011, Plaintiff applied for SSI benefits alleging that he became disabled on January 1, 2010, due to back pain, poor vision, and depression. (R. 112-18, 130.) Plaintiff's application was initially denied and again upon reconsideration. (R. 54-57, 63-65.)

On November 16, 2012, an Administrative Law Judge ("ALJ") held a hearing at which Plaintiff and a vocational expert testified. (R. 29-51.) On December 5, 2012, the ALJ issued a decision finding Plaintiff not disabled and denying his claim for SSI benefits. (R. 11-24.) In denying Plaintiff's claim, the ALJ made the following findings:

1.     The claimant has not engaged in substantial gainful activity since June 24, 2011 [application date] (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairment: decreased vision (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record . . . the claimant has the residual functional capacity to perform a full range of work at all exertional levels but he is limited to work requiring only frequent near visual acuity.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on March 18, 1970 and was 41 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since June 24, 2011, the date the application was filed (20 CFR 416.920(g)).

(R. 13-24.)

On February 27, 2014, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 1-3.) Plaintiff now requests judicial review of the ALJ's December 5, 2012, decision denying his SSI claim.

**B. Factual Background**

**(1)** *Plaintiff's Background*

Plaintiff was born on March 18, 1970, and was 42 years old when the ALJ issued his decision. (R. 24, 112.) He completed the tenth grade and last worked on January 1, 2010, when he was fired from his job. (R. 32-33.) Plaintiff alleges that he is disabled because of depression, frequent anxiety attacks, and psychotic episodes involving auditory and visual hallucinations. (R. 33-35, 38-39, 43-45.)

**(2)** *Overview of Medical Evidence*

During most of the relevant period, Plaintiff was incarcerated and the majority of his medical records are from the prison medical center. Beginning in September 2010, Dr. Becky Nagy, Psy.D., conducted a psychological evaluation of Plaintiff. (R. 265-68.) Plaintiff reported to Dr. Nagy that he had been treated for anxiety and depression at a mental health facility prior to his incarceration. (R. 265.) His treatment first began in 2006 when his son was killed. *Id.* He was diagnosed with post-traumatic stress disorder at that time because he saw his son's face on television. *Id.* During his current incarceration, Plaintiff had anxiety attacks two to three times a week for several weeks prior to the evaluation. *Id.* During these attacks, Plaintiff experienced shortness of breath, dizziness, and chest pain. *Id.* He was prescribed Celexa[1], which helped to control his depressive symptoms. *Id.* Dr. Nagy assessed Plaintiff's mental status as normal but his mood was anxious. (R. 267.) She diagnosed Plaintiff with anxiety disorder, a history of cannabis and cocaine abuse, and depression.

---

[1] Celexa is used to treat depression. Celexa Information from Drugs.com, http://www.drugs.com/celexa.html (last visited Sept. 19, 2015).

*Id.* Dr. Nagy also evaluated Plaintiff's level of psychological, social, and occupational functioning and assigned him a Global Assessment of Functioning ("GAF") score of 65.[2] *Id.*

During his incarceration, Plaintiff attended monthly therapy sessions and took psychotropic medications. In October 2010, he reported continued stabilization of his depressive symptoms while taking Celexa. (R. 256.) However, in November 2010, after reporting some negative medication side effects, Plaintiff was prescribed Remeron[3] and his dosage of Perphenazine[4] was increased. (R. 241.) After the medication change, Plaintiff reported a remission in his anxiety and depressive symptoms the following month. (R. 231.)

In November 2010, Carolyn Kruger, a licensed clinical social worker, performed a psychological evaluation of Plaintiff. (R. 246-48.) At that time, he was having difficulty with anxiety and depression and Celexa was less effective in controlling his symptoms. (R. 246.) Plaintiff was sleeping too much and exhibited poor hygiene. *Id.* A mental status examination indicated Plaintiff's psychomotor behaviors were hypoactive, his affect was flat, his mood was depressed, his short-term memory was impaired, and his reasoning was poor. (R. 247.) Plaintiff's

---

[2] The GAF includes a scale ranging from zero to 100, and is a measure of an individual's "psychological, social, and occupational functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Tex. Rev. 2000) ("DSM–IV–TR"). A GAF score of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

[3] Remeron is used to treat major depressive disorders. Remeron Information from Drugs.com, http://www.drugs.com/remeron.html (last visited Sept. 19, 2015).

[4] Perphenazine is used to treat psychotic disorders such as schizophrenia. Perphanazine Information from Drugs.com, http://www.drugs.com/mtm/perphenazine.html (last visited Sept. 19, 2015).

impulse control, judgment, and insight were characterized as fair. *Id.* Ms. Kruger diagnosed Plaintiff with anxiety disorder, depression, and a GAF score of 60.[5] *Id.*

Prior to his release from prison in June 2011, Gloria Potter, a licensed clinical social worker, conducted a psychological evaluation of Plaintiff. (R. 195-97.) A mental status examination indicated Plaintiff's affect and mood were labile. (R. 196.) However, his speech was appropriate and his thought processes were logical. *Id.* Ms. Potter assessed Plaintiff's reasoning, impulse control, judgment, and insight as being fair. *Id.* Plaintiff was released from the prison's mental health services and diagnosed with anxiety disorder, a history of cannabis and cocaine abuse, and depression. *Id.* He was assessed with having a GAF score of 65. *Id.*

In August 2011, Dr. Brandon Robbins, Psy.D., conducted a consultative mental status examination of Plaintiff. (R. 298-301.) He explained to Dr. Robbins that he developed significant depressive symptoms after his son died in 2006. (R. 298.) At that time, his symptoms included a depressed mood, diminished interest in activities, fatigue, and feelings of worthlessness. (R. 298-99.) Plaintiff occasionally had difficulty sleeping and sometimes felt anxious. (R. 299.) Plaintiff reported he was last employed in 2010 as a housekeeper at a healthcare center. *Id.* He worked there for three years, "but [he] got into it with [his] boss." *Id.* However, he could not recall the specific incident that resulted in the mutual termination of his job. *Id.* Plaintiff explained he was released from prison in June 2011, after being incarcerated for a year, and was previously incarcerated from 2004 through 2008 and on two other occasions. *Id.*

---

[5] A GAF score of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

Plaintiff's mental status examination produced essentially normal results but he exhibited poor judgment and insight. (R. 299-300.) His affect was flat throughout the examination. (R. 299.) Dr. Robbins diagnosed recurrent major depressive disorder of mild severity, cannabis dependence (sustained full remission), antisocial personality traits, and a GAF score of 63. (R. 300.) Despite his ongoing depressive disturbances, Dr. Robbins opined that Plaintiff's examination did not "reveal the presence of psychological difficulties that would preclude him from obtaining and maintaining employment." *Id.* He explained that Plaintiff was capable of "following and remembering simple instructions, making adequate work-related decisions, and sustaining his concentration on simple tasks over a normal 8-hour work-day." *Id.* According to Dr. Robbins, Plaintiff had adequate social behavior and was capable of applying that behavior in a work environment. *Id.* However, he also opined that Plaintiff may have difficulty in work environments requiring frequent interaction with a boss. *Id.*

Toward the end of August 2011, Dr. Joelle Larsen, Ph.D., a state agency psychologist reviewed Plaintiff's medical file and assessed his ability to perform work-related activities. (R. 310-22, 324-36.) Dr. Larsen diagnosed Plaintiff with affective, anxiety-related, and substance addiction disorders. (R. 310, 324.) She assessed Plaintiff as having mild limitations in activities of daily living, social functioning, and maintaining concentration, persistence, and pace. (R. 320.) Dr. Larsen determined that Plaintiff's psychological impairments were not severe and his allegations were only partially credible. (R. 322.) She gave weight to Dr. Robbins's assessment that Plaintiff's psychological impairments would not preclude him from maintaining employment. *Id.* Several months later, in December 2011, Dr. William Shipley, Ph.D., a state agency psychologist, affirmed Dr. Larsen's assessment. (R. 338.)

Plaintiff was incarcerated again in December 2011. (R. 341-48.) During his incarceration, he continued to be treated for depression and anxiety. (R. 341, 343-44, 347, 352-55, 357, 374-76.) In September 2012, Dr. Alfredo Tumbali, M.D., a psychiatrist, evaluated Plaintiff. (R. 383-87.) At that time, Plaintiff reported to Dr. Tumbali that he was repeatedly hearing the voice of his deceased son. (R. 383.) He explained that he was sad most of the time and his sleep, appetite and energy levels were poor. *Id.* Plaintiff's medications included Remeron, Cogentin[6], and Risperdal.[7] *Id.* Plaintiff indicated that these medications only "help[ed] a little." *Id.*

A mental status examination indicated Plaintiff was exhibiting signs of psychosis. (R. 384.) His affect was flat and his mood was anxious and depressed. *Id.* Plaintiff had poor reasoning, impulse control, judgment, and insight. *Id.* His thought processes were vague and concrete. *Id.* Plaintiff also had auditory hallucinations. *Id.* Dr. Tumbali diagnosed schizoaffective disorder and increased Plaintiff's dosage of Remeron and Risperdal. (R. 385-86.)

### (3) *Plaintiff's Testimony*

Plaintiff testified that he became disabled on January 1, 2010, when he was fired from his job. (R. 32.) His depressive symptoms began in 2006 after the death of his son. (R. 32-33.) Plaintiff was unable to work because he had a "problem with being around people." (R. 33.) He often had conflicts with co-workers and bosses, felt depressed, and could barely work. (R. 33-34.) When he was around people, Plaintiff would hear voices, feel paranoid, and become confused about

---

[6] Cogentin is used to treat the symptoms of Parkinson's disease, such as muscle spasms, stiffness, tremors, sweating, drooling, and poor muscle control and is also used to treat other conditions. Cogentin Information from Drugs.com, http://www.drugs.com/mtm/cogentin.htm (last visited Sept. 19. 2015).

[7] Risperdal is used to treat schizophrenia and symptoms of bipolar disorder (manic depression). Risperdal Information from Drugs.com, http://www.drugs.com/risperdal.html (last visited Sept. 19, 2015).

who was saying what.  (R. 34-35.)  Plaintiff explained that when people were talking he would think they were saying something else.  (R. 44.)  He would then get into arguments and become violent. *Id.*  His conflicts with supervisors were caused by hearing voices.  (R. 43.)  Plaintiff got into fights once or twice a week.  (R. 45.)

Plaintiff testified that he sometimes saw things running past him and he often saw his deceased son.  (R. 38.)  He had auditory and visual hallucinations every day and there was never a time during his waking hours that he was not hearing or seeing things.  *Id.*  The hallucinations interfered with his ability to concentrate and would upset him.  (R. 38-39.)  It would take time for him to calm down after he had a hallucination.  (R. 39.)  Plaintiff could concentrate for about 15 minutes, until he had a hallucination.  (R. 39-40.)  He also suffered from monthly anxiety attacks. (R. 34.)  When he was previously incarcerated, Plaintiff worked in the kitchen serving food but was removed from that job because he had an anxiety attack.  (R. 43.)  He was currently incarcerated because he held his girlfriend against her will.  *Id.*

**(4) *Vocational Expert's Testimony***

Dewey Franklin, a vocational expert, testified at the administrative hearing.  The ALJ posed a series of hypothetical questions to Franklin to determine if there were any jobs in the national economy that Plaintiff could perform.  (R. 46-49.)  The first hypothetical required Franklin to assume an individual with Plaintiff's age, education, work experience, and residual functional capacity who could perform work at all exertional levels but was limited to occupations requiring only frequent near acuity.  (R. 46.)  Based on these limitations, Franklin determined Plaintiff could perform jobs as a kitchen helper, church janitor, and laundry worker.  (R. 46-47.)  The ALJ posed

a second hypothetical to Franklin asking him to assume the same individual but that individual would be limited to medium exertional level work involving occupations requiring only frequent near acuity. (R. 47.) Franklin responded that the same three jobs would be available. *Id.*

The ALJ posed a third hypothetical asking Franklin to assume the same individual who could perform work at all exertional levels but was limited to simple, routine, and repetitive tasks with no production rate or pace work, could occasionally interact with supervisors, would be absent from work one day per month, and required only frequent near acuity. (R. 47.) Franklin testified there would no jobs that such an individual could perform given the frequent absenteeism and inability to be supervised on an occasional basis. *Id.* The ALJ's fourth hypothetical to Franklin altered the third hypothetical by limiting the same individual's work to that of being isolated with only occasional supervision. (R. 47-48). Franklin explained that only the church janitor job would be available. (R. 48.) In the final hypothetical, the ALJ reiterated the same limitations as in the fourth hypothetical but asked Franklin to assume work at the medium extertional level. *Id.* Franklin responded that the church janitor job would still be available. *Id.* Franklin also explained that if an individual would be off task 15 percent of the day or if an individual is absent one day per month, then there would be no jobs available. (R. 48-49.) Furthermore, in response to Plaintiff's attorney's questions, Franklin testified that there would be no jobs available if the same individual could concentrate for only 15 minutes at a time due to hallucinations and paranoia, and could not be around supervisors and co-workers because he got into frequent fights with them. (R. 49.)

**C. Standard of Review**

The applicable standard of review of the Commissioner's decision is a familiar one: the Court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court may not reevaluate the facts, reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether a plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Id.* Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the Court must reverse the decision regardless of the evidence supporting the factual findings. *Id.*

**D. Five-Step Inquiry**

An individual is "disabled" if he has an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). The Social Security Regulations set forth a five-step sequential inquiry for determining whether a claimant is disabled. The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to

perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted).

An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352. A negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 416.920; *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985) (citation omitted). The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id.* The Commissioner must then establish that the claimant—in light of his age, education, job experience and residual functional capacity to work—is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(f).

## E. Analysis

Plaintiff challenges a number of aspects of the ALJ's decision as they relate to the ALJ's analysis of his mental impairments.[8] He first argues that the ALJ erred at step three when he found that the combination of his mental impairments—schizoaffective, psychotic, depressive, and anxiety disorders—did not meet or equal Listing 12.03, or any other listed impairment. Plaintiff next contends that the ALJ erred by failing to summon a medical expert to determine if the combination of his mental impairments were medically equivalent to any listed impairment. Plaintiff then avers that the ALJ's credibility determination was flawed because he arbitrarily refused to acknowledge

---

[8] Plaintiff does not challenge any aspect of the ALJ's decision as it pertains to any alleged physical impairment(s).

Dr. Tumbali's diagnosis of schizoaffective disorder, which corroborated his allegations of disabling symptoms. He also claims that the credibility determination is contrary to Seventh Circuit law because the ALJ used boilerplate wording, resulting in the ALJ evaluating the credibility of his testimony after he assessed his residual functional capacity ("RFC") to perform work-related activities. Finally, Plaintiff contends that the ALJ's RFC finding is erroneous because it did not account for his mental impairments and any limitations stemming from those impairments. The Court now considers each of the asserted grounds in turn.

### *(1) Step Three and Medical Equivalence*

Plaintiff first claims that the ALJ committed reversible error at step three of the sequential evaluation because he ignored medical evidence, which established his mental impairments met or equaled a listed impairment. (Pl.'s Brief at 8-14.) In asserting his position, Plaintiff claims that Dr. Tumbali's diagnosis and findings indicate that his mental impairments meet or equal Listing 12.03. *Id.* The Commissioner defends the ALJ asserting Plaintiff has not identified any objective medical evidence that indicates he has a listing-level impairment. (Def.'s Mem. at 5.) According to the Commissioner, the ALJ was not required to find Plaintiff disabled solely on his subjective reports of hallucinations and a one-time diagnosis of schizoaffective disorder by a prison doctor. *Id.*

At step three of the sequential evaluation, an ALJ must determine whether a claimant is conclusively disabled based on one of the Social Security Administration's listed impairments. 20 C.F.R. § 416.920(d), 20 C.F.R. Pt. 404, Subpt. P, App. 1. Under the theory of presumptive disability, a claimant qualifies for benefits if he has an impairment or combination of impairments that meets or medically equals a listed impairment. *Id.* The ALJ "should mention the specific

listings he is considering and his failure to do so, if combined with a 'perfunctory analysis,' may require a remand." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir.2004)). However, the claimant "has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing." *Id.* (citing *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999)).

The ALJ did not discuss Listing 12.03, covering schizophrenic, paranoid and other psychotic disorders, because he concluded at step two that Plaintiff's mental impairments were not severe. 20 C.F.R. § 416.920a(b),(c),(d). When evaluating the severity of Plaintiff's mental impairments, the ALJ relied on the opinions of Dr. Robbins, who conducted a consultative mental status examination, and the state agency psychologists, who reviewed the medical record and completed disability forms. These psychologists concluded that Plaintiff's ongoing depressive and anxiety symptoms yielded only mild limitations and did not preclude Plaintiff from obtaining and maintaining employment. On the basis of these opinions, the ALJ assessed Plaintiff's functional limitations and concluded he had only mild limitations in activities of daily living, social functioning, and concentration, persistence, and pace, and had no episodes of decompensation. 20 C.F.R. § 416.920a(d)(1).

But here the ALJ's step two and step three analyses were flawed because he failed to discuss key aspects of the medical evidence when he evaluated the severity of Plaintiff's mental impairments. In his decision, the ALJ neither mentioned nor discussed Dr. Tumbali's medical findings from his September 2012 psychiatric evaluation of Plaintiff. Notably, Dr. Tumbali diagnosed Plaintiff with schizoaffective disorder and documented the fact that he was exhibiting signs of psychosis. (R. 384-85.) Dr. Tumbali noted that Plaintiff's psychotic symptoms included

13

relationship withdrawal, auditory hallucinations, and a disturbed effect. (R. 386.) Plaintiff's mental status examination indicated his affect was flat and his mood was anxious and depressed. (R. 384.) He exhibited poor reasoning, impulse control, judgment, and insight. *Id*. Plaintiff's thought processes were vague and concrete. *Id*. He repeatedly hearing the voice of his deceased son, felt said most of the time, and had poor sleep, appetite and energy levels. (R. 383.) Dr. Tumbali also noted Plaintiff's psychotropic medications included Remeron and Risperdal. *Id*.

Here, the ALJ's failure to discuss Dr. Tumbali's diagnosis and medical findings is troubling because schizoaffective disorder constitutes:

> [A] serious mental illness that has features of two different conditions—schizophrenia, and an affective (mood) disorder that may be diagnosed as either major depression or bipolar disorder.
>
> Schizophrenia is a brain disorder that distorts the way a person thinks, acts, expresses emotions, perceives reality, and relates to others. Depression is an illness that is marked by feelings of sadness, worthlessness, or hopelessness, as well as problems concentrating and remembering details. Bipolar disorder is characterized by cycling mood changes, including severe highs (mania) and lows (depression).
>
> Schizoaffective disorder is a life long illness that can impact all areas of daily living, including work or school, social contacts, and relationships.
>
> * * * *
>
> A person with schizoaffective disorder has severe changes in mood and some of the psychotic symptoms of schizophrenia, such as hallucinations, delusions, and disorganized thinking. Psychotic symptoms in schizoaffective disorder occur even when mood symptoms are no longer present, and reflect the person's inability to tell what is real from what is imagined.
>
> * * * *

WebMD, "Understanding Schizophrenia and Schizoaffective Disorder," www.webmd.com/schizophrenia/guide/mental-health-schizoaffective-disorder (last visited Sept. 19, 2015). As described, schizoaffective disorder is indicative of a severe mental impairment; one that may

14

significantly limit Plaintiff's ability to perform basic work activities. 20 C.F.R. § 416.920(c). Because the ALJ neither mentioned Dr. Tumbali's diagnosis nor discussed his medical findings, the Court cannot be confident that the ALJ appropriately considered this evidence when he assessed the severity of Plaintiff's mental impairments. *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (an ALJ must "sufficiently articulate his assessment of the evidence to assure us that [he] considered the important evidence . . . [and to enable] us to trace the path of [his] reasoning.") (internal quotation omitted).

As Plaintiff correctly points out, the ALJ failed to account for other pieces of record evidence when he assessed the severity of his mental impairments. While the ALJ relied on Plaintiff's normal mental status examinations in construing his impairments as being non-severe, there is also evidence which suggests otherwise. For example, Ms. Kruger's November 2010 mental status examination indicated Plaintiff's psychomotor behaviors were hypoactive, his affect was flat, his mood was depressed, his short-term memory was impaired, and his reasoning was poor. (R. 247.) Ms. Kruger noted that Plaintiff was sleeping too much and exhibited poor hygiene. (R. 246.) She also assessed him with a GAF score of 60, indicating he had moderate difficulties in social or occupational functioning. (R. 247.) But the ALJ never discussed Ms. Kruger's findings in his decision. Furthermore, while the ALJ did consider Dr. Robbins's finding that Plaintiff "may have difficulty in work environments which require[d] frequent interactions with a boss" he characterized this limitation as mild in the area of social functioning when the record suggests a greater limitation given Plaintiff's history of multiple job loses due to conflicts with supervisors and co-workers. (R. 16, 300.) The ALJ also did not factor into his analysis Plaintiff's difficulties in social functioning as evidenced by his four incarcerations.

Plaintiff next argues that the ALJ should have summoned a medical expert to testify as to whether his combined mental impairments medically equaled any listed impairment. (Pl.'s Brief at 15-17.) Here, he points out that the ALJ could not have reasonably relied on the opinions of the two state agency psychologists, who reviewed his medical file, because their assessments pre-dated Dr. Tumbali's September 2012 psychiatric evaluation. *Id.* However, the Commissioner contends that the ALJ appropriately relied on the state agency psychologists' opinions because Dr. Tumbali's evaluation indicated Plaintiff's mental status examination was normal and he only had mild symptoms. (Def.'s Mem. at 6.) Thus, according to the Commissioner, Dr. Tumbali's assessment would not have provided a basis for the state agency psychologists to change their opinions. *Id.*

Under the regulations, an ALJ is required to obtain an updated opinion of a medical expert when "additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." Social Security Ruling ("SSR") 96-6p, 1996 WL 374180, at *4 (July 2, 1996). In light of the fact that Dr. Tumbali's September 2012 psychiatric evaluation was not reviewed by the two state agency psychologists, who completed their assessments in 2011, the ALJ should have obtained an updated opinion as to the severity of Plaintiff's mental impairments, and also as to medical equivalence.

Based on these shortcomings, the ALJ's finding that Plaintiff's mental impairments were not severe and the implication that his impairments did not satisfy a listing-level impairment must be reconsidered on remand. The ALJ shall consider Dr. Tumbali's 2012 psychiatric evaluation along with any other relevant evidence in the record in his evaluation of the severity of Plaintiff's mental impairments. In so doing, the ALJ shall determine whether Plaintiff's impairments meet or equal

the requirements for Listing 12.03, or any other listed impairment. 20 C.F.R. Pt. 404, Subpt. P, App. 1. *See Graves v. Astrue*, 1:11-CV-249, 2012 WL 4019533, at *3-4 (S.D. Ind. Sept. 11, 2012) (remanding in part to reconsider the severity of the claimant's mental impairments and determine if the claimant's impairments satisfy a listing-level impairment).

### *(2) Credibility Determination*

Plaintiff next contends that the ALJ's credibility determination was patently erroneous because he failed to account for Dr. Tumbali's diagnosis and findings, which corroborated his allegations of disabling symptoms. (Pl.'s Brief at 18-19.) He also argues that the ALJ erred by using boilerplate wording criticized by the Seventh Circuit, causing the ALJ to assess the credibility of his testimony after he developed the RFC finding. *Id.* at 19-20. The Commissioner, however, avers that the ALJ found Plaintiff's allegations were not as severe as he alleged because his mental status examinations were normal, his response to medication was positive, his mental health treatment only took place while he was incarcerated, and his accounts of his daily activities were conflicting. (Def.'s Mem. at 7-8.)

An ALJ's credibility finding will be afforded "considerable deference" and will be overturned only if it is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citations omitted). "A credibility assessment is afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (citation omitted). However, where the credibility determination is based on objective factors rather than subjective considerations, the court has greater freedom to review the ALJ's decision. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). Therefore, where "the

reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result," an ALJ's credibility determination will not be upheld. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

The ALJ's central error in assessing the credibility of Plaintiff's testimony was his failure to take into account the findings from Dr. Tumbali's September 2012 psychiatric evaluation, which substantiated Plaintiff's hearing testimony. As discussed, Dr. Tumbali diagnosed Plaintiff with a serious mental illness—schizoaffective disorder—and documented multiple psychotic symptoms, including hallucinations. (R. 383-86.) At the hearing, Plaintiff testified he had hallucinations every day and could concentrate for about 15 minutes, until he had a hallucination. (R. 38-40) He had difficulty being around people because he would hear voices and become confused about who was saying what. (R. 33-35.) When people were talking, Plaintiff thought they were saying something else, which led to conflicts with co-workers and supervisors. (R. 43-44.) Because the ALJ neglected to discuss Dr. Tumbali's findings, he never evaluated the credibility of Plaintiff's testimony in the context of these findings.

The ALJ also found Plaintiff's testimony not credible on a number of other improper bases. The ALJ discounted Plaintiff's testimony because he failed to follow-up with formal mental health treatment after he was released from prison. (R. 21, 22.) But here the ALJ did not explore why Plaintiff did not seek treatment. Thus, it was improper for the ALJ to "draw any inferences about [Plaintiff's] condition . . . [without having] explored [Plaintiff's] explanations as to the lack of medical care." *Craft*, 539 F.3d at 679 (citation omitted). The ALJ also found the severity of Plaintiff's alleged symptoms not credible because he "frequently reported great benefit from [his] medications" and noted that his symptoms were "in remission." (R. 21.) Here, the ALJ concluded

18

that Plaintiff's "symptoms did not significantly affect his functioning" because he consistently acknowledged that his medications were effective. *Id.* While it is true that, after a medication change in December 2010, Plaintiff reported a remission in his anxiety and depressive symptoms, he later reported to Dr. Tumbali in September 2012 that his medications only "help[ed] a little." (R. 231, 383.) Furthermore, while the ALJ apparently relied on Plaintiff's normal mental status examinations to discredit his testimony, Dr. Tumbali's findings are indicative of a serious mental illness, which may cause significant functional limitations. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) ("[A] person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about [his] overall condition.") Finally, the ALJ discredited Plaintiff's testimony because he found his reports of his daily activities inconsistent, but even if the ALJ is correct on this point, that reason alone is not enough for this Court to affirm the ALJ's credibility determination.[9]

Based on these shortcomings, this Court cannot uphold the ALJ's credibility determination. On remand, the ALJ must reevaluate Plaintiff's testimony with due regard for the full range of medical evidence. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (the ALJ is required to build an "accurate and logical bridge from the evidence to [his] conclusion.") (citation omitted).

### (3) Steps Four and Five

Plaintiff's final argument is that the ALJ failed to account for his mental impairments when he assessed his RFC to perform work-related activities. (Pl.'s Brief at 21-22.) Plaintiff points out

---

[9] Even though erroneous, the ALJ's credibility determination was detailed and did not consist of only boilerplate language. *Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012).

that the ALJ's RFC finding limited him to "work requiring only frequent near acuity" but did not account for distractions caused by his paranoia and unpredictable auditory and visual hallucinations. *Id*. at 21. The Commissioner defends the ALJ stating that the RFC finding was proper because there is no objective medical evidence to support a finding that Plaintiff had significantly limiting mental impairments. (Def.'s Mem. at 7.)

"The RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); *see also* 20 C.F.R. § 416.945(a)(1). In evaluating a claimant's RFC, an ALJ is expected to take into consideration all of the relevant evidence, including both medical and non-medical evidence. *See* 20 C.F.R. § 416.945(a)(3). According to the regulations:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). Although an ALJ is not required to discuss every piece of evidence, he must consider all of the evidence that is relevant to the disability determination and provide enough analysis in his decision to permit meaningful judicial review. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *Young*, 362 F.3d at 1002. In other words, the ALJ must build an accurate and logical bridge from the evidence to his ultimate conclusion. *Scott*, 297 F.3d at 595.

As discussed throughout this opinion, the Court has determined that the ALJ's failure to discuss Dr. Tumbali's diagnosis and findings constitutes reversible error. At steps four and five, the ALJ's failure to consider this evidence is problematic because Franklin testified that there would be no jobs available if an individual could concentrate for only 15 minutes at a time due to hallucinations and could not be around supervisors or co-workers because he would get into frequent fights due to his psychotic symptoms. (R. 49.) Franklin also testified that if an individual were off task for 15 percent of the day, there would be no jobs available for that individual. *Id*. Given Plaintiff's testimony about the nature and frequency of his hallucinations, the ALJ should have discussed the impact his hallucinations would have on his ability to sustain work-related activities.

Because the ALJ has not constructed an accurate and logical bridge between Plaintiff's impairments, supported by substantial evidence in the record, and the RFC assessment, a remand on this issue is warranted. *Clifford*, 227 F.3d at 871 (an ALJ must consider "*all* relevant evidence" and may not analyze only that information supporting the ALJ's final conclusion) (emphasis in original); *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) ("In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments . . . and may not dismiss a line of evidence contrary to the ruling.").

Furthermore, on remand, the ALJ must propound new hypothetical questions to the vocational expert taking into account all of Plaintiff's limitations that are supported by the record evidence. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). The ALJ shall also "consider the combined effect of all of [Plaintiff's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 416.923.

**CONCLUSION**

For the foregoing reasons, the ALJ's decision and the Commissioner's subsequent denial of Plaintiff's SSI benefits is reversed, and this case is remanded with instructions to return the matter to the Social Security Administration for further proceedings consistent with this Opinion.

SO ORDERED on September 30, 2015.

s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE
HAMMOND DIVISION